Argued March 5, Court of Appeals decision reversed;
defendant's conviction affirmed May 15,
petition for rehearing denied June 6, 1979.

## STATE OF OREGON, *Petitioner,*
### *v.*
## STEVEN JAMES COLE, *Respondent.*
## (TC C 77-08-11096, CA 9650, SC 25960)

595 P2d 466

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Gary D. Babcock, Public Defender, Salem, argued the cause and filed the brief for respondent. With him on the brief was C. William Rehm, Law Intern, Salem.

TONGUE, J.

Linde, J., specially concurring opinion.

**TONGUE, J.**

Defendant was convicted of conspiracy to commit armed robbery. At the end of the first day of trial, and after a jury had been selected and sworn, the trial judge became ill and entered the hospital. The next morning the jury was dismissed. Before being retried and convicted three weeks later defendant moved to dismiss the indictment for "former jeopardy." The trial court denied that motion. The Court of Appeals reversed. 37 Or App 199, 586 P2d 386 (1978).[1] We allowed the state's petition for review.

The facts, as they relate to the question of double jeopardy, are as follows:

The first trial of the defendant began on August 29, 1977, before Judge William M. Dale. After argument on various motions a jury was selected and sworn. Late that afternoon, and before any testimony had been taken or arguments made, the court was adjourned for the day. Judge Dale, who had not been feeling well for several days, went to his doctor who examined him and sent him to a hospital for tests to be made the next day. He remained in the hospital for one week.

Upon entering the hospital at about 8:00 p.m. on August 29th, Judge Dale did not know how many days he would be required to remain there but knew that he would not be able to preside at the trial the next day. He then called his clerk, told him that he could not continue with the trial because of his illness, and instructed his clerk to call counsel by telephone and inform them that he would be unable to do so and that the jury would be discharged. The clerk then called defendant's attorney and told him that the jury was going to be discharged because Judge Dale was sick and unable to return to court the next day.

---

[1] On appeal to the Court of Appeals defendant not only contended that the trial court erred in denying that motion, but that the trial court erred in failing on its own motion to declare a judgment of acquittal due to the state's failure to prove venue. Defendant made no motion for judgment of acquittal for failure of the state to prove proper venue. For that reason we decline to decide that question in this case.

[413]

Neither the state nor the defendant wanted a mistrial. According to defendant's attorney, he told the clerk in that telephone coversation that he and his client were satisfied with the jury and asked the clerk to ask Judge Dale to retain the jury and set the trial over for one day, but was told that Judge Dale had stated that he was going to be gone for two days because of his illness and that he could not continue with the trial because of his illness.

■ The next morning (August 30th) at 9:30 a.m., as defendant's attorney entered the courtroom without his client, the clerk was about to go into the jury room to dismiss the jury. Either then or by telephone on the previous evening there was some discussion between the clerk and Judge Dale of the question whether the trial should be postponed for a "couple of days," rather than to dismiss the jury, and Judge Dale "indicated" to his clerk that he "could not continue in the trial due to his illness."

The next day (August 31st) the prosecuting attorney and defendant's attorney appeared before Judge John C. Beatty, Presiding Criminal Judge, at which time the case was set for retrial on September 15, 1977. At that time defendant's attorney stated his desire to make a record of his objections to the dismissal of the jury. Judge Beatty then ruled that he would ratify and confirm the action of Judge Dale. There was then the following colloquy:

Mr. Anderson [attorney for defendant]: "The only point I wanted to make is, I did not have an opportunity to formally object on the record because there was no record."

The Court: "Well, that is true. But under our law when a judge is unable to continue, and Judge Dale was unable to continue and is ill, you cannot continue with another judge."

Mr. Anderson: "Well, I realize that, Your Honor. There is a question of whether the jury could have been maintained in its present status and just left in a holding pattern for a few days to see what developed."

[414]

The Court: "I don't think we leave jurors in a holding pattern."[2]

Judge Beatty also noted at that time that the "manifest necessity" for the mistrial had been "confirmed by the fact that [Judge Dale] remains ill."

At the beginning of the new trial on September 16, 1977, defendant moved to dismiss the indictment for "former jeopardy," supported by the affidavit of defendant's attorney. At that time testimony was taken, including testimony by the defendant that he was satisfied with the original jury and wanted to proceed with the original trial. He then testified as follows:

Q. "What would you have done had an alternative procedure been recommended, such as getting another judge or holding the jury for a couple of days and then proceeding later?"

A. "Well, first of all, let me say that I didn't particularly want another judge. I wanted that particular judge, and I was satisfied with him, myself."

Q. "Okay. How about the jury? Were you satisfied with the jury?"

A. "Yes, I was definitely satisfied with the jury."

Q. "If they had offered us another judge instead of Judge Dale, what would you have done?"

A. "Well, I don't think I would have accepted that because, like I said, I was satisfied with the judge."

---

[2] The transcript of that hearing on August 31, 1977, was not included in the designation of record on defendant's appeal from his conviction. After the adverse decision by the Court of Appeals and after filing its petition for review of that decision, the state moved for leave to file an amended designation of record to include the transcript of that proceeding. Defendant opposed the motion upon the ground that this court has no "jurisdiction" to consider such a motion because it was not filed within ten days of defendant's designation of record, as provided by ORS 19.029(2). The motion was taken under advisement at the time of oral argument.

In view of the provisions of ORS 19.033(3), it would appear that any such deficiency is not jurisdictional. Also by reason of the provisions of ORS 19.108(1), this court may excuse the untimeliness of the motion and permit the designation of the transcript of that hearing under its power to "supplement the record as may be just" when the record is "incomplete." Accordingly, we allow the motion of the state to file the transcript of the proceedings on August 31, 1977, and shall consider that transcript to be a proper part of the record in these proceedings.

[415]

Q. "Mr. Cole, if they had offered us another judge and I had said to you, 'We should take—' "

Mr. Davis: "Objection. It's a leading question. He's asked and answered the question for us."

Mr. Anderson: "Well, Your Honor, I—"

The Court: "For the purpose of this inquiry, he may go ahead."

Q. (By Mr. Anderson) "Mr. Cole, if they offered us another judge and I told you to take this judge and proceed with the trial, that that's the only way we could keep the jury; would you have done it?"

A. "I had to do whatever my attorney suggested."[3]

At the hearing on that motion the prosecuting attorney called as witnesses Judge Dale and his clerk, who testified to the facts as previously stated.[4]

Upon the conclusion of the testimony, defendant's attorney contended in argument that he should have had an opportunity by Judge Dale to say "[G]ive me a new judge or let's let the jury sit for a couple of days and see how sick you really are"; that defendant did not have "any opportunity to propose those alternatives," and that Judge Dale made no attempt to call any other judge.

The trial court then denied defendant's motion, holding that Judge Dale had not abused his discretion; that the state had shown a "manifest necessity" and that there is no double jeopardy "when it is physically impossible to proceed with the trial in conformity with the law."

---

[3] This was the first time that any suggestion had been made by defendant or his attorney that defendant might have been willing to proceed with another judge, presumably depending upon whether arrangements could be made for the trial to proceed with another judge who would be acceptable to him. Indeed, defendant's written motion and the affidavit attached to it suggested only that the trial should have been postponed, not that it proceed with another judge.

[4] Judge Dale's clerk was also asked whether defendant's attorney had requested that another judge come in "to handle the mistrial proceedings" and responded that "[i]t was discussed, but I don't know if it was ever discussed in the form of a request * * *."

In reversing defendant's conviction because of the denial by the trial court of defendant's motion to dismiss the indictment for "former jeopardy," the Court of Appeals held that the constitutional standard of "manifest necessity" requires that "a trial not be terminated if any reasonable alternative action is possible under the facts of each case" (37 Or App at 202); that in this case the state had the burden to show that the alternatives of either a continuance or a continuance of the trial with a new judge and the same jury were not available; that the state had failed to sustain its burden to prove that such alternatives were not available, and that in the absence of such evidence there was no evidence sufficient to sustain the finding by the trial court that there was a "manifest necessity" to declare a mistrial. (37 Or App at 203)

In arriving at that conclusion, the Court of Appeals cited and sought to apply to this case the recent decision by the Supreme Court of the United States in *Arizona v. Washington,* 434 US 497, 98 S Ct 824, 54 L Ed 2d 717 (1978). We believe, however, that the Court of Appeals misconstrued and misapplied the requirements of that case to the facts as presented by this case.

Before considering the requirements of "manifest necessity," as stated in *Arizona,* for the termination of a criminal trial without a jury verdict, however, we must first consider the requirements for "necessity" as provided by statute in Oregon by ORS 131.525, which was enacted in 1973 as a part of the then-new Oregon Criminal Procedure Code.[5] ORS 131.525(2) was based

---

[5] ORS 131.525 provides that:

"A previous prosecution is not a bar to a subsequent prosecution when the previous prosecution was properly terminated under any of the following circumstances:"

"* * * * *

"(2) The trial court finds that a termination, other than by judgment of acquittal, is necessary because:

"(a) It is physically impossible to proceed with the trial in conformity with law; or

upon § 1.08(4)(b) of the Model Penal Code, as prepared and published by the American Law Institute in 1961.[6] It appears from the Commentary to the Tentative Draft of the Model Penal Code that this provision was drafted in an effort to make "somewhat more specific" the test of "manifest necessity," as set forth in *United States v. Perez*, 22 US (9 Wheat) 579, ___ S Ct ___, 6 L Ed 165 (1824), by stating five "general reasons which justify termination," including (1) "physical necessity," (2) "legal necessity," (3) prejudicial conduct, (4) a "hung jury," and (5) false statements of a juror on voir dire.[7] One of the examples given of a "physical necessity" for the termination of a trial was "death or illness of the judge."

It follows, in our opinion, that the termination of the first trial of this defendant because of the illness of the trial judge was a termination for a "physical necessity" within the intended meaning of ORS 131.525. It remains, however, to consider whether the termination of the trial for that reason, and under the

---

"(b) There is a legal defect in the proceeding * * *; or

"(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the state; or

"(d) The jury is unable to agree upon a verdict; or

"(e) False statements of a juror on voir dire prevent a fair trial.

"* * * * *"

[6] Section 1.08(4)(b) of the Model Penal Code (ALI 1961) provides that termination of a previous prosecution is not improper (i.e., does not bar a subsequent prosecution) under any of the following circumstances:

"(1) it is physically impossible to proceed with the trial in conformity with law; or

"(2) there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law; or

"(3) prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the State; or

"(4) the jury is unable to agree upon a verdict; or

"(5) false statements of a juror on voir dire prevent a fair trial."

[7] *See* Model Penal Code, the American Law Institute Reprint-Tentative Drafts No.'s 5, 6 and 7, p. 54 (1956).

circumstances of this case, satisfied constitutional requirements.

Both the Oregon Constitution and the Constitution of the United States provide, in somewhat different terms, that a defendant in a criminal case has a right not to be put in jeopardy twice for the same offense.[8]

■ As stated in *Arizona* (434 US at 503), the right of a defendant in a criminal case to "have his trial completed by a particular tribunal" is a "valued right" for various important reasons. As also held in *Arizona* (at 505), that right is nevertheless "sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury."

In determining whether to permit the retrial of a defendant in a criminal case following the termination of a previous trial before a verdict has been reached, the Supreme Court of the United States, beginning in 1824 with its decision in *United States v. Perez, supra,* has established the requirement of "manifest necessity" as a standard for application in such cases. It would serve no useful purpose in this case to review or attempt to analyze the various decisions by the United States Supreme Court since *Perez* and prior to its most recent decision on that subject in *Arizona.*[9]

---

[8] The Fifth Amendment of the Constitution of the United States provides:

"No person shall * * * be twice put in jeopardy of life or limb * * *."

Article I, § 12 of the Oregon Constitution provides:

"No person shall be put in jeopardy twice for the same offence (sic) * * *."

No contention is made by either party that these two provisions should be construed differently as applied to this case.

[9] *See, e.g., Gori v. United States,* 367 US 364, 81 S Ct 1523, 6 L Ed 2d 901 (1961); *Downum v. United States,* 372 US 734, 83 S Ct 1033, 10 L Ed 2d 100 (1963); *United States v. Jorn,* 400 US 470, 91 S Ct 547, 27 L Ed 2d 543 (1970); and *Illinois v. Somerville,* 410 US 458, 93 S Ct 1066, 35 L Ed 2d 425 (1973).

*See also* Schulhofer, *Jeopardy and Mistrials,* 125 Pa L Rev 449 (1977), and *Comment,* 69 NW L Rev 887 (1975).

In *Arizona* the court, in discussing the requirement of "manifest necessity" as applied to the facts of that case, recognized (at 505) that there are "[a] variety of circumstances that may make it necessary to discharge a jury before a trial is concluded * * *." The court went on (at 507-508) to say that:

"The question whether that 'high degree' [of 'manifest necessity'] has been reached is answered [more] easily in some kinds of cases than in others. At one extreme are cases in which the prosecutor requests a mistrial in order to buttress weaknesses in his evidence. * * * Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the state to harass or to achieve a tactical advantage over the accused."

The court then stated (at 509) that:

"At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered a classic basis for a proper mistrial. * * *

"Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not 'manifest necessity' justifies the discharge of [a] jury."

In addition, the court said (at 505) that:

"* * * [I]n view of the importance of the [defendant's] right [not to be put twice in jeopardy] and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying a mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant."

The court in *Arizona* refused, however, to reverse the exercise of discretion by the trial judge in granting a mistrial case upon the ground that he did not expressly state that in arriving at his finding of "necessity" he had considered possible alternatives to the granting of a mistrial. The court said (at 516-517):

"The state trial judge's mistrial declaration is not subject to collateral attack in a federal court simply because he failed to find 'manifest necessity' in those words or to articulate in the record all the factors which informed the deliberate exercise of his discretion."

In considering the application of the requirements for a finding of "manifest necessity" as stated in *Arizona,* we believe it to be of significance to note the nature and extent of the "spectrum" as described by the court in that case. As an example of one "extreme" end of the "spectrum," the court in *Arizona* (at 507) referred to cases in which the prosecution requests a mistrial because critical prosecution evidence is unavailable, in which the "strictest scrutiny" would be required. As an example of the "other extreme" end of that "spectrum" the court referred to cases in which the jury is unable to agree on a verdict, in which the trial court has "broad discretion." In both of the examples chosen as representing the two "extreme" ends of the "spectrum," the decision whether or not to declare a mistrial would be made by a trial judge during the course of the trial and in open court, where he was present and able to exercise his discretion in a proper manner by giving consideration to arguments and contentions by both parties, including not only objections by the defendant, but also possible alternatives to the declaration of a mistrial.

Having so described such a "spectrum," we find nothing to indicate that the court in *Arizona* intended to include in that "spectrum" cases in which the "manifest necessity" for the discharge of the jury was a physical necessity arising from the death of the trial judge or his serious illness of such a nature as to confine him to a hospital. In either of such events, it would not be possible for the trial judge in charge of the case to make the decision whether or not to declare a mistrial in open court, where he would be able to give proper consideration to arguments and contentions by

the parties, including objections by defendant or possible alternatives, such as a postponement of the trial or the substitution of another judge to continue the trial. In other words, in such a case it would be impossible, as a practical matter, for the trial judge to exercise his judicial discretion in the manner contemplated by the court in *Arizona.*

■    Indeed, it is the presently established law in Oregon, as held by this court in *State v. Chandler et al,* 128 Or 204, 274 P 303 (1929), that the declaration of a mistrial by the trial court is a part of the trial of a criminal case at which the defendant charged with a felony has a statutory right (under ORS 136.040) to be present, with the result that the presence of the defendant is essential to the validity of such proceedings. In that case the jury was discharged by the trial court in the absence of the defendant for failure to agree on a verdict. In addition, this court said in *Chandler* (at 209):

> "* * * [W]e think it reasonable to assume that, if defendant had been present with his counsel and objection had been made to the discharge of the jury on account of the short time covered by their deliberations, the court would have been more reluctant so to act. We hold that the presence of the defendant was essential to the validity of the proceedings and the unlawful discharge of the jury is, in legal effect, an acquittal of the defendant. * * *"

Defendant insists upon a literal application of the rule as stated in *Chandler* to the facts of this case. Our decision in *Chandler* had no intended application to cases in which juries must be discharged because of the death or serious illness of the trial judge. That decision does, however, illustrate the practical problems that would arise if it be held, as contended by the defendant in this case, that a judge who has become so ill as to be confined to the hospital must then, and while sick and in the hospital, hear arguments and objections and consider all possible alternatives to a discharge of the jury, and must exercise his judicial discretion in making that decision in the manner

contemplated by *Arizona* for application in cases of such a nature as to be within the two "extremes" of the "spectrum" as described by the court in that case.

■ We agree with the analysis in *State v. Schuler,* 293 NC 34, 235 SE 2d 226, 233 (1977), in which the court held, although under different facts, that there are "two kinds of necessity" in double jeopardy cases involving mistrials for reasons of "necessity": (1) "physical necessity" — or "physical and absolute necessity," as distinguished from (2) the "necessity of doing justice," which arises from the duty of the court to "guard the administration of justice" from prejudice, as in cases involving improper conduct by either party. Indeed, as previously noted, a distinction is made in Oregon by statute (ORS 131.525) between "necessity" to dismiss the jury in a criminal case because "[i]t is physically impossible to proceed with the trial in conformity with law," and necessity because of "prejudicial conduct" or inability of the jury to agree, among other things.[10]

Although neither this court nor the United States Supreme Court has previously had occasion to consider the problem of "necessity" for the discharge of a jury in a criminal case because of the death or serious illness of the trial judge, it appears that most, if not all, other courts that have considered the question have held that double jeopardy does not attach in such a case. Thus, in *State v. Brunn,* 22 Wash 2d 120, 154 P2d 826 (1945), the court said (154 P2d at 837) that:

> "It is now almost universally held that a dismissal of a jury without the defendant's consent will not acquit a defendant if done on account of illness or death of the trial judge * * *."

To the same effect, *see, e.g., Westover v. State,* 66 Ariz 145, 185 P2d 315, 317 (1947); *Commonwealth v. Robson,* 461 Pa 615, 337 A2d 573, 577 (1975); *People ex rel Brinkman v. Barr,* 248 NY 126, 161 NE 444, 445 (1928); *Henderson v. State,* 95 Okla Cr 342, 246 P2d

_____

[10] *See* note 5, *supra.*

393, 399-401 (1952); *People v. Upshaw,* 13 Cal 3d 29, 117 Cal Rptr 668, 528 P2d 756, 759 (1974); and *State v. Varnado,* 124 La 711, 50 So 661 (1909).[11]

■ For these reasons we hold that when, as in this case, the trial judge has become so seriously ill as to be confined to a hospital, and when it is expected that he may be required to remain in the hospital for more than one day (and in this case did remain for one week), the state, upon proof of such facts (which are admitted in this case), has sustained its burden to show that there was such a "manifest necessity" as to justify the dismissal of the jury and avoid the bar of double jeopardy.

■ We believe, however, that even if cases involving the death or serious illness of the trial judge must be considered as within the "spectrum" as described in *Arizona,* so as to require application of the flexible standard of review as also described in that case, the facts of this case would place it at the "extreme end" of the "spectrum" as a case in which the trial judge would be allowed to exercise "broad discretion." (*See* 434 US at 509) The record shows that Judge Dale did consider and reject the possible alternative of postponement of the trial, and for good reason because, as matters developed, he was in the hospital for a week. Under *Arizona* no express finding that he had considered that alternative is required.

■ As for the possible alternative of continuing the trial before a different judge in a case in which the trial judge has died or become so ill as to be confined to a hospital, we do not believe that under the flexible standard of *Arizona,* the state was required to show that no other judge is available to continue the trial. We cannot believe that the Supreme Court of the United States intended in *Arizona* to impose such a

---

[11] Some of these cases may be distinguishable on their facts, as pointed out by defendant. They all, however, support the general rule that death or serious illness of the trial judge provides such a "necessity" as to justify dismissal of the jury.

[424]

burden upon the state's attorney, even assuming that defendant would consent to continue the trial before such a judge.

It may be, as contended by defendant, that if defendant then refused to accept such a judge he would waive his right to object to the discharge of the jury and to a retrial of the case. In this case, however, the defendant testified at the time of his subsequent trial, "I don't think I would have accepted [another judge] * * *." Although he then said, in response to a highly improper leading question by his attorney, and over objection by the state, that he "had to do whatever my attorney suggested," there is nothing in the record to show that either defendant or his attorney would have agreed to the continuation of the trial before any other judge. A further indication to the contrary is the fact that defendant's attorney made no such suggestion when he appeared before Judge Beatty on August 31, 1977 (the day after discharge of the jury) to "make a record" of his reasons for objection to the mistrial, stating only his desire at that time to have the jury "held" until Judge Dale might return from the hospital.

These facts may or may not be sufficient to constitute a waiver by defendant of the possible alternative of a continued trial before another judge. We believe, however, that under the facts and circumstances of this case there was such a "manifest necessity" as to justify the dismissal of the jury and to bar defendant's claim of double jeopardy.[12]

For these reasons, we reverse the decision by the Court of Appeals and affirm the conviction of the defendant.

---

[12] It is suggested in the concurring opinion by Linde, J., that even in a case in which there has been a "physical necessity" for the termination of a trial, as in the event of the death or serious illness of the trial judge, as in this case, the defense of double jeopardy may or may not be available, depending upon whether such an event occurred early in the trial or late in the trial. No such contention was made by either party in this case and we need not decide that possible question in this case.

[425]

**LINDE, J.,** specially concurring.

As the Court's opinion states, the trial judge in this case became incapacitated after the jury was selected and sworn but before any testimony was taken. Under the circumstances, the risk of serious prejudice to the defendant was not such as to require the state to take the initiative of attempting to find another judge to complete the trial.

In a case in which witnesses have been examined and cross-examined, including perhaps the defendant himself, the mistrial might be much more prejudicial, and the state's burden of showing that it is "impossible to proceed with the trial," ORS 131.525, when the defendant is prepared to continue with a new judge might arguably be greater. Of course, in the light of the statute and article I, section 12 of the constitution,[1] that question does not hinge on decisions of the United States Supreme Court. I add this brief opinion only to draw attention to the fact that the issue is not presented or decided in this case.

---

[1] Or Const, art I, §12:

No person shall be put in jeopardy twice for the same offence . . . .